**2014-1825, -1826**

# In the
# United States Court of Appeals
# for the Federal Circuit

PERSONALIZED MEDIA COMMUNICATIONS, L.L.C.,
*Plaintiff-Appellee*,

v.

ECHOSTAR CORPORATION, DISH NETWORK CORPORATION, FKA ECHOSTAR
COMMUNICATIONS CORPORATION, ROVI GUIDES, INC., TVG-PMC, INC.,
*Defendants-Appellants.*

Appeal from the United States District Court for the Eastern District of Texas in
No. 2:08-cv-00070-RSP, Magistrate Judge Roy S. Payne

## CORRECTED NONCONFIDENTIAL BRIEF OF
## DEFENDANTS-APPELLANTS ROVI GUIDES, INC. AND TVG-PMC, INC.

Joel L. Thollander
McKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
(512) 692-8700

Roderick G. Dorman
*Principal Attorney*
Marc Morris
McKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA 90017
(213) 694-1200

*Attorneys for Defendants-Appellants
Rovi Guides, Inc. and TVG-PMC, Inc.*

January 21, 2015

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants Rovi Guides, Inc. and TVG-PMC, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

Rovi Guides, Inc. and TVG-PMC, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Rovi Guides, Inc. and TVG-PMC, Inc. are wholly owned subsidiaries of Rovi Corporation.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**MCKOOL SMITH HENNIGAN, P.C.:** Roderick G. Dorman and Marc Morris

**MCKOOL SMITH, P.C.:** Samuel F. Baxter, Joel L. Thollander, and Daniel L. Geyser

**GILLAM & SMITH, LLP:** Melissa R. Smith

**ASHE, RAFUSE & HILL, LLP:** William B. Hill, Jr. and Joseph C. Sharp (both are now with **POLSINELLI PC**)

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF RELATED CASES ............................................... vii

I.    STATEMENT OF JURISDICTION ................................................1

II.   STATEMENT OF THE ISSUES ...................................................1

III.  STATEMENT OF THE CASE .......................................................2

      A.    Relief Requested.....................................................................2

      B.    Preliminary Statement. ..........................................................2

      C.    The Background of the Exclusive IPG License: Rovi and PMC Negotiated for Broad, End-to-End Coverage of Rovi's Full-Featured Interactive Program Guide Systems. .................6

      D.    The Text of the Exclusive IPG License: Best Read as Providing Broad, End-to-End Coverage of Full-Featured Interactive Program Guide Systems....................................15

      E.    The Georgia Litigation: the First District Court to Address the Exclusive IPG License Finds a Broad Reading "Persuasive," But Ultimately Concludes That the License Is Ambiguous. .................................................19

      F.    This Litigation: Notwithstanding the Georgia Court's Holding, the Magistrate Concludes That the License Is Unambiguously Narrow, and the District Court Denies Timely Objections. ............................................................24

IV.  SUMMARY OF ARGUMENT....................................................27

V.   ARGUMENT...............................................................................32

      A.    Standard of Review ..............................................................32

      B.    The District Court Erred in Construing the Exclusive License..............................................................................33

1.      The parties' competing proposals confirm that the license is ambiguous—requiring consideration of the extrinsic evidence...................................................34

2.      The extrinsic evidence supports Rovi's reading and forecloses the district court's construction. .............................44

3.      This Court should remand for a proper construction following full consideration of the extrinsic evidence...................................................48

C.    The District Court Erred in Granting Summary Judgment. ..........................................................................49

1.      The summary judgment rests on an erroneous construction of the exclusive IPG license.................................51

2.      PMC failed to identify or introduce competent summary-judgment evidence of any kind.................................51

3.      Under any construction, genuine disputes of material fact preclude summary judgment.................................53

VI.   CONCLUSION AND RELIEF REQUESTED.............................................58

## CONFIDENTIAL MATERIAL OMITTED

Material is omitted on particular pages as follows: 1 and 2 - confidential payment amounts; 8 and 9 - confidential internal memoranda subject to protective order; 11 and 12 - confidential license agreements; 13 - confidential license agreements and confidential deposition transcripts subject to protective order; 14 - confidential correspondence and confidential payment amounts; 15 - confidential deposition transcripts subject to protective order; 31 - confidential internal memoranda subject to protective order; 36 and 46 - deposition transcripts subject to protective order; 54 - confidential deposition transcripts subject to protective order; 55 - confidential internal memoranda subject to protective order, confidential pleading filed under seal, and confidential expert reports; 57 - confidential deposition transcripts subject to protective order; 58 - confidential pleading filed under seal.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ........................................................................32

*Bayou Steel Corp. v. Nat'l Union Fire Ins. Co.*,
   642 F.3d 506 (5th Cir. 2011) ...............................................................32, 49, 51

*Comrie v. Enterasys Networks, Inc.*,
   837 A.2d 1 (Del. Ch. 2003) .........................................................33, 38, 40, 48

*ConAgra Foods, Inc. v. Lexington Ins. Co.*,
   21 A.3d 62 (Del. 2011) ................................................................40, 43, 48

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   469 F.3d 1005 (Fed. Cir. 2006) ........................................................................32

*Diamond Offshore Co. v. A & B Builders*,
   302 F.3d 531 (5th Cir. 2002) ...............................................................50, 52, 53

*Eagle Indus. v. DeVilbiss Health Care*,
   702 A.2d 1228 (Del. 1997) ..........................................................33, 40, 43, 48

*Haverda v. Hays Cnty.*,
   723 F.3d 586 (5th Cir. 2013) ............................................... 32, 50, 54, 55, 56, 58

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
   965 A.2d 715 (Del. Ch. 2008) ........................................................................49

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) ........................................................................53

*Isquith v. Middle S. Utils.*,
   847 F.2d 186 (5th Cir. 1988) ...................................................................50, 52

*Jacobs v. Nintendo of Am., Inc.*,
   370 F.3d 1097 (Fed. Cir. 2004) ........................................................................38

*Johnston v. City of Houston*,
   14 F.3d 1056 (5th Cir. 1994) ...............................................................49, 52

*King v. Dogan*,
   31 F.3d 344 (5th Cir. 1994) ................................................................52, 53

*L&W, Inc. v. Shertech, Inc.*,
   471 F.3d 1311 (Fed. Cir. 2006) ..............................................................49

*Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*,
   831 F.2d 77 (5th Cir. 1987) ....................................................................50

*O'Brien v. Progressive N. Ins. Co.*,
   785 A.2d 281 (Del. 2001) ........................................................................36

*Personalized Media Commc'ns, LLC v. Scientific-Atlanta, Inc.*,
   493 F. App'x 78 (Fed. Cir. 2012) (unpublished)...................................24

*Phillips Home Builders v. Travelers Ins. Co.*,
   700 A.2d 127 (Del. 1997) .................................... 32, 33, 40, 43, 49, 51

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)................................................................................50

*Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*,
   616 A.2d 1192 (Del. 1992) ......................................32, 33, 38, 40, 48

*Robertshaw v. Pudles*, No. 11-CV-7353,
   2013 U.S. Dist. LEXIS 109806 (E.D. Pa. Aug. 5, 2013) ...................50

*Russ v. Int'l Paper Co.*,
   943 F.2d 589 (5th Cir. 1991) ..............................................50, 52, 53

*Saab Cars USA, Inc. v. United States*,
   434 F.3d 1359 (Fed. Cir. 2006) ..............................................50, 53

*Twin City Fire Ins. Co. v. Del. Racing Ass'n*,
   840 A.2d 624 (Del. 2003) ......................................................................40

**Statutes**

28 U.S.C. § 1295 ......................................................................................1

v

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1338 .................................................................................1

28 U.S.C. § 1367 .................................................................................1

28 U.S.C. § 2107 .................................................................................1

## Other Authorities

FED. R. APP. 4 .....................................................................................1

FED. R. CIV. P. 54 ...........................................................................1, 27

FED. R. CIV. P. 56 .........................................................................49, 52

11 JAMES WM. MOORE ET AL.,
    MOORE'S FEDERAL PRACTICE ¶ 56.40[1][c] (3d ed. 2014)................................49

## STATEMENT OF RELATED CASES

Pursuant to FED. CIR. R. 47.5, Defendants-Appellants Rovi Guides, Inc. and TVG-PMC, Inc. (collectively, Rovi) note that:

(a) there have been no other appeals in this case, although there was a previous appeal from a generally related case—*Personalized Media Commc'ns, LLC v. Scientific-Atlanta, Inc.*, No. 11-1466, 493 F. App'x 78 (Fed. Cir. Aug. 23, 2012) (then-Chief Judge Rader with Judges Mayer & Dyk) (unpublished); and

(b) aside from the present case, there are no other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# I.  STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367, and this Court has jurisdiction under 28 U.S.C. § 1295(a). A4529. The judgment, made final and appealable under FED. R. CIV. P. 54(b), was entered on August 12, 2014. A13. The notice of appeal was timely filed under 28 U.S.C. § 2107(a) and FED. R. APP. 4(a) on September 9, 2014. A6503-04.

# II. STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that an exclusive license is *unambiguous* and requires an extremely narrow interpretation where: (a) another district court concluded that the same license is *ambiguous* and susceptible to multiple interpretations, ranging from narrow to expansive; (b) the agreement's ambiguity is further confirmed by an alternative, middle-ground interpretation that best accords with the parties' manifest intent; (c) the middle-ground interpretation also best aligns with the relevant extrinsic evidence; and (d) the extremely narrow interpretation adopted by the district court discounts a critical license provision, effectively guts the key component of a ██████ multi-part transaction, and conflicts with both the parties' manifest intent and the extrinsic evidence.

2. Whether the district court erred in granting summary judgment for PMC where: (a) the judgment was based on the court's erroneous interpretation of the exclusive license; (b) PMC failed to introduce competent summary-judgment

1

CONFIDENTIAL MATERIAL OMITTED

evidence of any kind; and (c) under any interpretation of the license, genuine disputes of material fact precluded the summary judgment.

## III.    STATEMENT OF THE CASE

### A.    Relief Requested.

This appeal concerns the ambiguous scope of an exclusive license covering the "**I**nteractive **P**rogram **G**uide field." A2362 (emphasis added). The district court erred in concluding that the license agreement was legally unambiguous and *narrowly* construing its scope without first considering the illuminating extrinsic evidence—including the testimony of both lead negotiators, who agreed that the licensed IPG field was intended to be *broad* in scope. A5-6; A5615; A5171. The remedy Rovi seeks for this error is straightforward: this Court should simply hold that the scope of the licensed field-of-use is ambiguous (as did another court addressing the same provision of the same license), and remand for a correct construction after full consideration of the extrinsic evidence.

### B.    Preliminary Statement.

The exclusive IPG license containing the disputed field-of-use was the lynchpin of a heavily negotiated, ███████ transaction between PMC and entities that have now been merged into Rovi. A4654; A5046. The grant was manifestly intended by both parties to provide complete, end-to-end coverage for the full-featured IPG products that constituted Rovi's core business—including, in

2

particular, TV Guide Interactive. A2365; A5046. The following high-level description from a TV Guide Interactive reference manual should sound familiar to anyone who has paid to receive television programming through a set-top box:

> Pause live television! Rewind and replay programs so you don't miss a beat. Record up to 60 hours of your favorite programs and view them as many times as you want, whenever you want. ... [W]ith TV Guide Interactive, you can effortlessly find the show you want. ... TV Guide Interactive puts you in control, all at the touch of a button. Set reminders, Favorites, Parental Controls and more. With TV Guide Interactive, the world of Digital Cable is at your fingertips.

A4902. This robust IPG product thus provided descriptive information relating to television programming combined with extensive functionality to control the viewing, recording, and storing of that programming. A5300-01.

Intending "to license a field-of-use that included that product, all of its features and functions, and its planned expansion" (A5086), the parties set out to define a licensed IPG field with a commensurately broad scope (A5615). But while the intent for the agreement was clear, aspects of its ultimate expression—owing perhaps in part to numerous revisions over many months—were not crystal clear. In particular, the first sentence of the paragraph defining the licensed field calls out "IPG Applications" that [**1a**] have a "primary purpose" of "provid[ing] descriptive information ... relating to television or radio programming available to Consumers" and [**1b**] "may, or through actions by a Consumer may, control Consumer equipment that enables viewing, listening, recording, or storing of such television

3

or radio programming ....” A2; A2360. The next sentence flatly states that: “[**2**] Such IPG Applications shall include, without limitation, tuning, flip, browse, parental control, recording, ... video on demand, near video on demand, [and] pay per view,” among numerous other functions. A2.

The ambiguous language in and relationship between these two sentences has led to the present dispute, in which three parties offer three interpretations of this critical provision defining the scope of the exclusively licensed field-of-use.

PMC proposes that each of the functions separately identified in sentence two [**2**] is only covered if it independently satisfies the “primary purpose” requirement of sentence one [**1a**]. Under this (narrow) reading, tuning, recording, parental control, and each of the other listed functions is covered only if its primary purpose is to provide descriptive information. One critical problem with this narrow reading—adopted by the district court in this case (A5-6)—is that tuning, recording, and parental control *never* have the primary purpose of providing descriptive information, and thus cannot independently satisfy the “primary purpose” requirement. As presently construed, the license effectively covers only extremely limited IPG systems, and would not cover TV Guide Interactive—the product Rovi secured the license to cover. While PMC advocates this interpretation here, PMC’s general counsel has elsewhere rejected such an approach. A5598.

4

EchoStar proposes that the grant of coverage in sentence two [**2**] is completely independent from the "primary purpose" requirement in sentence one [**1a**]. Under this (expansive) reading, the second sentence provides full, unconditional, and stand-alone coverage of the specified functionalities. A5-6.

Rovi submits the contract language supports, and the parties intended, a third interpretation: the provision should be read to provide complete, end-to-end coverage of a robust IPG system—such that, *when connected to the use of a guide that satisfies the "primary purpose" requirement* of sentence one [**1a**], the many functionalities specified in sentence two [**2**] are covered in their entirety. Under this (middle-ground) reading, the second sentence [**2**] links back to the second clause of the first sentence [**1b**]—which describes features that may be connected with a guide "application" and that may "control Consumer equipment that enables viewing, listening, recording or storing of" programming. A2; A2360. These are the very types of features called out in sentence two [**2**]. Rovi's middle-ground reading ensures that the full-featured IPG systems the parties set out to cover are covered (A2365), and aligns with the parties' manifest intent for the broad (but not unlimited) scope of their significant transaction (A5046).

While Rovi submits that its middle-ground reading is the proper and best reading of the disputed provision, it does not ask the Court to definitively construe the scope of the exclusive IPG license. Instead, the ambiguity of the disputed

language, and the existence of these three alternative interpretations, confirm that the license is ambiguous as a matter of law. Significantly, this was the conclusion of the first district court to address the same issue regarding the same exclusive IPG license in the Northern District of Georgia. A5248-50. The appropriate remedy is thus simply to remand for a proper construction of the disputed language following full consideration of the extrinsic evidence.

### C.    The Background of the Exclusive IPG License: Rovi and PMC Negotiated for Broad, End-to-End Coverage of Rovi's Full-Featured Interactive Program Guide Systems.

*PMC provides a very different license to StarSight.*

The story of the PMC-Rovi license, signed in 2000, actually begins years earlier with the PMC-StarSight license, signed in 1994. A2359; A5049. In the early 1990s, StarSight Telecast, Inc. produced a stand-alone box implementing an interactive program guide for use with satellite television. A4650; A4981. StarSight sought a license for its IPG system from PMC—a licensing entity holding the so-called "Harvey patents," which disclose various inventions in the "interactive digital communication space." A4980; A5043. In 1994, PMC entered an agreement with StarSight providing an exclusive license to the Harvey patents within the "field of Navigation and Navigation information practiced in the Defined Markets by means of Defined Delivery Systems." A4651.

6

Just one year later, a dispute arose between PMC and StarSight as to the scope of the licensed field. A4981-82. StarSight believed the license provided full coverage for its IPG system—including features associated with the guide, such as one-touch recording. A4981. PMC disagreed. According to PMC, the license covered a "very narrow field of use." A5050. Because StarSight "didn't pay much money for the license," in PMC's view its principal purpose was "to establish a relationship with PMC," rather than to provide full coverage for StarSight's IPG system. A5050. This very narrow field simply provided "a license to go to a display screen, to click through it, but once you clicked out, you were out of the field-of-use." A5076. Thus, according to PMC, "there were significant features, interactive program guide features, which were not included in the StarSight license, things along the lines of recording, other basic functions." A5018.

As Thomas Scott (PMC's outside counsel) then explained, "[i]t's one thing to deliver the schedule information and to control the device to display the schedule information, that's what the [StarSight] field was as written. It's another to have the software resident in the computer at the receiver site, then command other elements either of a box or peripheral equipment to do certain functionality." A5079. PMC thus took the position that the StarSight license covered interactive program guides to the extent of delivery, display, and navigation of program information—but only covered *access* to the related functionality (such as

7

recording) offered by IPG systems. A5076; A5050. Once "you clicked out" of the screen displaying program information, "you were out of the field-of-use." A5076. Under this reading, in order for StarSight to make full use of its IPG system, it "would have required yet another license." A5078; A5018; A5053; A5156.

The dispute between PMC and StarSight had escalated to litigation when Rovi (then Gemstar) acquired StarSight in 1997. A4981-82; A5045-46; A4651.

*PMC hires an IPG consultant and begins negotiations with United Video.*

In the meantime, PMC was investigating additional licensing opportunities in the IPG field. A5069-73. PMC hired Joseph Stern as a consultant to assist in this process, and he put together a list identifying a "███████████████████████

█████████████████████████████████" matched with potentially "██████████

█████████████████████." A5160; A5070-71; A4982. Stern's list began with

"████████████████████████████████," but then identified dozens of

additional ████████████████████████████████████████

████████████████████. A5159-64. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

8
**CONFIDENTIAL MATERIAL OMITTED**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ A5160-63.

Stern's list confirmed that IPGs provided descriptive information relating to programming *as well as* potentially extensive functionality to control interaction with that programming. A5159-63. Armed with this understanding, PMC approached United Video in 1998 with an offer to license the Harvey patents in an IPG field-of-use. A4982; A5053-57. Before negotiations were completed, United Video acquired TV Guide in early 1999, and that combined company was in turn acquired by and merged with Gemstar in 2000. A5021. The Gemstar entity that resulted from the TV Guide, United Video, and StarSight acquisitions is now known as Rovi Guides, Inc.—and this collection of companies, along with sister corporation and co-appellant TVG-PMC, will be referred to as Rovi going forward.

*PMC continues negotiations with Rovi.*

Following these acquisitions and mergers, Rovi picked up the licensing negotiations that PMC had started with United Video. A4983. From the start, Rovi made clear that it had no interest in repeating StarSight's experience with PMC: any exclusive IPG license would have to cover Rovi's feature-rich IPG systems— and reasonable future extensions of those systems—end-to-end, in their entirety.

9

A5087-90; A5184; A5208; A5586. As Scott (PMC's outside counsel) explained, Rovi "didn't want to articulate it in a way that would run into the problem that StarSight ran into that articulated [the licensed field] in a narrow way." A5087. Instead, Rovi insisted on "a field-of-use in which its product was fully covered." A5088. That is, Rovi insisted on a field-of-use that covered "the guide products, as they existed, and then the reasonable enhancements of a guide product that they would make in the future." A5084. Gerald Holtzman (PMC's general counsel and lead negotiator) agreed: Rovi "wanted to make sure that their existing and future guide products were covered fully and exclusively." A5058.

As of April 2000, the parties had "developed a mutual understanding that the exclusive fields-of-use" would cover Rovi's "actual business activities and reasonable further extensions thereof." A5024. The parties repeatedly confirmed this understanding and objective over the course of their negotiations through December 2000. A5031; A5184; A5592.

One of Rovi's flagship IPG products at this time was TV Guide Interactive. As Scott noted, the parties set out "to license a field-of-use that included that product, all of its features and functions, and its planned expansion," and to do so on an exclusive basis. A5086. To ensure that PMC had a full understanding of that product and all of its features and functions, Scott traveled to Oklahoma to inspect the TV Guide Interactive system and to take part in a demonstration of its

10

capabilities on a set-top box. A5036-38. Scott observed a feature-rich, complex, software-based IPG product that—like Stern's IPG list—did far more than display descriptive information. A5299. It also offered (among other features) tuning, flip, browse, parental control, reminders, favorites, searching and sorting, help, user profile setup, and pay per view. A5300-01; A5039. Recording capability was in the process of being added to the product, and video on demand functionality was under active development. A5039. Furthermore, when Rovi's full-featured IPG product was loaded onto a set-top box, it controlled all of these functions whether or not the user command came through a displayed IPG screen. A5301.

In the early stages of the negotiations—before Scott's on-site inspection— PMC was proposing a cramped field of use that, echoing PMC's narrow approach to the StarSight license, was defined with respect to IPG screens displaying descriptive information. An early draft provided, in part:



11

CONFIDENTIAL MATERIAL OMITTED

A5188-89 (underlining and brackets omitted, italics added). Rovi rejected this approach as it "was quite limited and not consistent with what [Rovi] had in mind. It was very display-oriented, meaning the relevant features and functions were tied to specific screens. That was a concept that didn't work for us at all." A5027.

Rovi's IPG products involved "a central system, aggregation of data, processing and distribution to head ends around the country, which in turn had to distribute data to all of the users' homes that had set top boxes." A5027. With "software at every one of those stops along the way" and "hardware at all those stops along the way," a display-based definition was wholly inadequate to provide the end-to-end IPG coverage that Rovi demanded. A5027-28. As Holtzman acknowledged, the initial field-of-use drafts envisioned "the right to put VOD [video on demand] on a screen in the IPG and allow the consumer to access that VOD from that IPG screen." A5059. But "in the early May time frame [Rovi's counsel] came in and said that wasn't working for them, that their client had indicated that they needed to take a different approach." A5059.

By the middle of May, after much discussion regarding the full-featured IPG products being covered, the proposed field-of-use had changed substantially:



12



A5621-22 (emphasis added).

This closer-to-final draft reflected the reality that the covered IPG systems provided descriptive information relating to programming *as well as* features to control the viewing, recording, and storing of that programming.[1] Regarding the list of control-related functionality, Joseph Guiliano (Rovi's outside counsel and lead negotiator) testified that "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." A5171.

In October 2000, Rovi's board of directors requested confirmation that the exclusive IPG license being negotiated would provide Rovi with rights far beyond

---

[1] The final draft changes "███████████████████████████████████████," (A5621) to "applications and services" (A2)—clarifying that the *features* of an IPG are not independently subject to the "primary purpose" requirement.

CONFIDENTIAL MATERIAL OMITTED

those provided in the StarSight license. A5061-62. Holtzman wrote a letter confirming PMC's view that the proposed IPG field provided far broader coverage:



A5293; A5063. Holtzman also explained that the few IPG-related functions recited in the StarSight license were "█████████████" such that "██████████████████ ████████████████████████████████████ ██████████████████████████████████████"—in contrast to the functions recited in the Rovi license, "███████████████████ ████████████████████████████" A5293 (emphasis added).

With PMC's reassurances that the limitations of the StarSight license would not apply, and that Rovi would not again find itself in a "situation where products could be sold [by Rovi] that were not covered by the license that we were trying to get" (A5586), the parties finalized their exclusive IPG license agreement in December 2000 (A4778). This license was the lynchpin of a █████████ multi-part transaction between the parties that included a number of other exclusive and

14

non-exclusive licenses, resolution of the dispute with StarSight, and a minority ownership interest in PMC. A4654; A5045-46; A5708-09; A6278.

While the transaction had many pieces in play, it was clear to PMC "[f]rom the beginning [that Rovi was] most interested in the—what became known as the exclusive IPG license." A5046; A5180. Securing this broad, end-to-end license for its full-featured IPG products was critical to Rovi's business. A5046; A5180. PMC's Holtzman agreed that PMC provided Rovi with "a big broad feature-rich IPG field-of-use, an IPG that people could use for lots of different things" (A5597), and that "███████████████████████████████

████████████████████████████████████████

████████████████████" (A5615-16).

### D.  The Text of the Exclusive IPG License: Best Read as Providing Broad, End-to-End Coverage of Full-Featured Interactive Program Guide Systems.

The exclusive IPG license grants to Rovi, in paragraph 2.1, "a perpetual, irrevocable, fully paid-up, worldwide, exclusive license, including the right to sublicense, to make, have made, use, sell, offer to sell, import or lease the inventions disclosed and claimed in the Patent Rights within the Interactive Program Guide field." A1; A2362. The covered "Patent Rights" are defined broadly in paragraph 1.5: "any and all patents ... and other patent rights of any kind

15

... now or in the future owned by PMC, or under which PMC otherwise has or will have the right to grant licenses." A2361. Paragraph 2.1 further provides that:

> PMC acknowledges and agrees that this *exclusive license includes all of the inventions disclosed or claimed in the Patent Rights when used within the Interactive Program Guide field*, even though particular inventions may not be expressly recited in the Interactive Program Guide field. For example, but not by way of limitation, although 'metering' is not expressly recited in the Interactive Program Guide field, *the inventions disclosed or claimed in the Patent Rights relating to 'metering,' when used in the Interactive Program Guide field, are included in this exclusive license*.

A2362 (emphasis added). Thus, while the agreement covers the recited "Interactive Program Guide field," paragraph 2.1 makes clear that there is no limit to the number of PMC's inventions that can be implemented within that licensed field.

In paragraph 2.6, PMC further acknowledges and agrees "that the Interactive Program Guide field, either alone or in combination with other fields of use licensed to [Rovi] under the Patent Rights on the Effective Date, encompasses existing interactive program guides, such as those interactive program guides provided by, for example, [Rovi] or any of its Affiliates. These include, for example, set-top box-based (e.g., TV Guide Interactive and Prevue Express) and Internet-based (e.g., TV Guide On-line) interactive program guides provided by [Rovi] or any of its Affiliates." A2365. This reflects the parties' extensive negotiations, discussions, and on-site visits relating to coverage of Rovi's full-featured IPG systems—TV Guide Interactive in particular. A5058; A5036-38.

Paragraph 5.11 addresses the other agreements signed the same day:

> This Exclusive IPG License Agreement *shall not be construed in any way to be limited, impaired, or superseded by the non-exclusive licenses* granted ... as of the Effective Date .... To the extent that the licenses granted in the Non-exclusive License Agreements, or the exercise of those non-exclusive license rights, overlap *the licenses granted in this Exclusive IPG License Agreement*, or the exercise of these exclusive license rights within the Interactive Program Guide field, the Exclusive IPG License Agreement, and the exclusivity of the license rights granted herein, *shall be deemed controlling*.

A2371 (emphasis added); A5708-09. The parties thus acknowledged the other license agreements entered contemporaneously and, while expressly recognizing the possibility of overlap, provided that the exclusive IPG license would control.

The critical provision remaining—the provision at the heart of the dispute in this case—is found in paragraph 1.3, which (in seven sentences) defines the exclusively licensed IPG field. The provision is quoted here in its entirety, with each sentence (and sub-clause) numbered (and lettered) for ease of reference:

> [**1**] The 'Interactive Program Guide' field means applications and services (collectively 'IPG Applications'), [**1a**] *the primary purpose of which is to provide descriptive information* (including without limitation program listings) relating to television or radio programming available to Consumers, [**1b**] and *which may, or through actions by a Consumer may, control Consumer equipment that enables viewing, listening, recording or storing of such television or radio programming*, [**1c**] but where such IPG applications are not primarily intended to provide descriptive information relating solely to advertising or promotional programming available to Consumers. [**2**] *Such IPG Applications shall include, without limitation, tuning, flip, browse, parental control, recording, reminders, favorites, searching or sorting listings by any category or criteria, video on demand, near video on demand, pay per view,* picture in guide

17

functionality, help, user profile setup, generation or use, TV mail, TV chat, and TV newsgroups. [**3**] The Interactive Program Guide field *shall also include the ability to access from such IPG Applications any other interactive or passive application*, service or feature; provided, however, that the creation, distribution, transmission and use by a Consumer of such other interactive or passive applications, features, or services or the television or radio programming accessible through such IPG Applications shall not be deemed to be included in the Interactive Program Guide field. [**4**] The Interactive Program Guide field *shall further include the ability to provide additional programming created or provided by* [*Rovi*] or any of its Affiliates that may be unrelated to the primary purpose of the Interactive Program Guide field, which additional programming is integral to and a part of the IPG Applications, and where the purpose of such additional programming is to be viewed or heard by a Consumer while using the IPG Applications. [**5**] The Interactive Program Guide field *shall further include any supplemental video, audio, text, graphics or multimedia, including but not limited to advertising or e-commerce opportunities of any kind, provided within the IPG Applications*. [**6**] The Interactive Program Guide field shall further include the generation and transmission of information resulting from the use of the above-described functionality (*'Backhaul Data'*). [**7**] The Interactive Program Guide *field shall also include any device, portion of device, or process to the extent that it is used to implement the above-described functionality*, which functionality may be provided via any Media.

A2; A2360-61 (emphasis added).

The parties thus ultimately rejected a narrow field based on navigation through screens displaying program information in favor of "a big broad feature-rich IPG field-of-use," A5597; A5616—one intended to provide end-to-end coverage of Rovi's IPG systems (such as TV Guide Interactive), and reflecting the dual nature of such systems as providing [**1a**] descriptive information relating to programming *as well as* [**1b**] extensive functionality allowing control of that

18

programming. A4899-4956; A5299-302; A5084-85. Rovi was in the business of providing an electronic navigational product that facilitated location, access, viewing, recording, and a host of other functions associated with content to be displayed on a television. PMC understood that Rovi was purchasing an exclusive license to all of PMC's patent rights related to Rovi's business.

E.     **The Georgia Litigation: the First District Court to Address the Exclusive IPG License Finds a Broad Reading "Persuasive," But Ultimately Concludes That the License Is Ambiguous.**

Two years after signing the exclusive IPG license agreement—which gave Rovi the right to sublicense or sue for infringement within the licensed IPG field (A1; A2362-63)—PMC sued Scientific-Atlanta in the Northern District of Georgia for alleged infringement of the Harvey patents. A1796-98. Because Rovi had granted Scientific-Atlanta a sublicense, and because PMC incorrectly contended that Scientific-Atlanta's conduct was not covered by that sublicense, Rovi joined the Georgia litigation to defend the scope of its exclusive IPG license with PMC. A1418. Unsurprisingly, the relationship between Rovi and PMC deteriorated, and Rovi relinquished its minority ownership interest in PMC. A2348.

The dispute regarding the scope of the exclusive IPG license centered on the first two sentences of paragraph 1.3. A5248. Under one (narrow) reading, each of the control-related functions recited in sentence two [**2**] must individually satisfy the "primary purpose" requirement in sentence one [**1a**]—such that each of tuning,

19

parental control, recording, and the other listed functions is licensed only if its "primary purpose ... is to provide descriptive information ...." A2360; A5248-49. Under another (expansive) reading, the "phrase 'Such IPG Applications shall include, without limitation,' means that the ensuing list of Specified Applications [**2**] must be included in the IPG Field, without debate as to whether they meet any requirement set out in the first sentence [**1**] of Paragraph 1.3." A5249.

The Georgia district court, noting that PMC's narrow reading rendered "the second sentence of Paragraph 1.3 meaningless," found the arguments supporting the expansive reading of these sentences "more persuasive." A5249-50. Nevertheless, because the sentences were fairly susceptible to both interpretations, the court concluded that the field-of-use provision was legally ambiguous under the governing Delaware law. A5248. It then held a four-day bench trial to consider extrinsic evidence that could assist in resolving this ambiguity. A4984-85. Much of the evidence discussed above was presented during that trial.[2]

With respect to the proposed alternative constructions, the testimony of PMC's general counsel and lead negotiator was particularly instructive. While PMC had argued to the Georgia court that the functions listed in the second

---

[2] As recounted below, due to settlement, the court ultimately dismissed the Georgia case prior to construing the license in accordance with the extrinsic evidence.

sentence [**2**] must each independently satisfy the "primary purpose" requirement in the first sentence [**1a**] (A5248), Holtzman flatly rejected that reading on the stand:

> Q. For these features to be included in the IPG field, they do not have to provide descriptive information related to television and radio programming. Isn't that true?
> A. Sure, most of them can't.
> Q. And one of those functions and features is tuning.
> A. Yes, sir.
> Q. And tuning is absolutely necessary for an IPG to work.
> A. That's what we understood.

A5598.

In that brief exchange, Holtzman confirmed *both* that the parties did not intend that the listed functions would be independently subject to the "primary purpose" requirement *and* that it would make little sense to subject those functions to that requirement—because many of the listed functions, with tuning as a critical example, *are not at all directed to providing descriptive information* related to programming. A5598. The primary purpose of those functions relates to control of programming, rather than to the provision of descriptive information. And because tuning "is absolutely necessary for an IPG to work," a reading that licensed tuning only when it provides descriptive information (that is, *never*) would result in an exclusive IPG license that covered only IPG systems that did not work. A5598.

Rather than support the reading proposed by PMC, Holtzman offered a very different interpretation of the first two sentences of paragraph 1.3:

21

[A]nything called out in that license agreement, the field license agreement, was included, and as best as we knew at the time and still believe to this day, all of those features are included in the license if the guide [which was Rovi's business] satisfies the primary purpose test. … [T]hat was our intent since the day we agreed .... If any of those features are included in an application or guide that satisfies the primary purpose test, all of those features, VOD, Pay Per View, any of them are licensed exclusively. But they are not licensed exclusively as stand-alone functions outside and away from a guide.

A10; A5063-64. Rovi's lead negotiator (Guiliano) testified to similar effect:

[W]e had an understanding from PMC as to how the prior license, the StarSight license, how they were interpreting it, and this was intended to convey that there could be a very long list of features and functions that a guide could provide that—and that guide would still be within the field-of-use as defined here. So long as you had an application that passed the primary purpose test, that it provided the description, descriptive information relating to programming, this sentence was ... intended to convey the notion that there could be considerable number of features and functions that the guide would provide ....

A9; A4311.

Both parties' lead negotiators thus read the critical provision to provide complete and exclusive coverage of the specified features—so long as they are offered, used, or accessed in connection with a "guide that satisfies the primary purpose test." A5064. Tuning, recording, pay per view, video on demand, and related applications are not exclusively licensed "as stand-alone functions outside and away from a guide." A5064. But when used, offered, or accessed in connection with an IPG, then any and all tuning, recording, pay per view, and video on

demand are exclusively licensed—without any separate requirement that these functions independently satisfy the primary purpose test. A5063-64; A9.

The reading proposed by Holtzman and Guiliano also indicated that the third sentence [**3**] of paragraph 1.3, which likewise generated conflicting interpretations, was not referencing "access" to the control-related features specified in the second sentence [**2**] and implemented with the licensed IPG systems. A2360; A5597; A5615; A5039; A4899-956; A5298-303. Instead, as Guiliano explained, the "the ability to access" described in sentence three [**3**] referred to accessing "other," third-party passive or interactive applications unrelated to the IPG systems:

> [T]he idea would be that some third party application provider might enter into a relationship with [Rovi] to basically allow [Rovi] to put a link in the guide that would enable a user to go to an unrelated application. For example, Yahoo. That was functionality that [Rovi] wanted to be able to provide and not be liable for infringement if it did. But the understanding was [that] by permitting that functionality, meaning the linking over, it was not intended to suddenly provide Yahoo with a blanket license under [Rovi]'s license.

A5033; A5040-41.

Following the four-day bench trial at which this illuminating extrinsic evidence was adduced, Rovi anticipated that the Georgia district court would construe the exclusive IPG license agreement along the lines outlined by Holtzman and Guiliano. But before the court issued its ruling, PMC moved to dismiss the action on the ground that the underlying infringement suit against Scientific-Atlanta had been settled. A4985; A5263. The Georgia court granted the motion,

23

and that dismissal was affirmed by this Court on the ground urged by PMC—that Rovi had adequate remedies, and the scope of its exclusive IPG license could be determined, in the Texas litigation involving EchoStar that underlies this appeal. *Personalized Media Commc'ns, LLC v. Scientific-Atlanta, Inc.*, 493 F. App'x 78, 83-84 (Fed. Cir. 2012) (unpublished); A5259-68.

## F.  This Litigation: Notwithstanding the Georgia Court's Holding, the Magistrate Concludes That the License Is Unambiguously Narrow, and the District Court Denies Timely Objections.

After settling the Georgia litigation with Scientific-Atlanta, PMC brought this suit in the Eastern District of Texas for infringement of the Harvey patents against EchoStar and Dish (collectively, EchoStar)—companies that have also been sublicensed by Rovi under its exclusive IPG license agreement with PMC. A1013-15; A1418. PMC accuses EchoStar of infringement through equipment that implements, among other things, "IPPV, VOD, interactive applications, data collection, access control and authorization" of television programming. A5719. In the EchoStar system, many of these applications are implemented in connection with an interactive program guide. A4105 ("use the **Program Guide** to change channels ... and to buy pay per view programs"); A4103-06 (indicating that tuning, favorites, parental control, and PPV, among other functions, are implemented in connection with an IPG); A5320 (indicating that VOD is implemented in connection with an IPG); A5335-36 (same); A5708 (same).

In light of these facts, Rovi had good reason to believe that at least some of PMC's assertions against EchoStar were covered by the exclusive IPG license agreement. Rovi thus moved to intervene in this litigation, and the district court ordered PMC to add Rovi to the suit through an amended complaint. A4504-09. PMC did so, adding Rovi as a defendant with respect to a claim for declaratory judgment. In particular, PMC's second amended complaint seeks a declaratory judgment that the exclusive IPG license is "limited to a defined 'IPG' (Interactive Program Guide) field of use," that the EchoStar sublicense is limited "to that same field of use," and that PMC's infringement claims against EchoStar "fall outside and are not covered by" that licensed "IPG field of use." A4538.

PMC moved for summary judgment on this claim. A1. In the Georgia litigation, PMC's general counsel flatly rejected an interpretation of paragraph 1.3 that would make each of the sentence two [**2**] functionalities independently subject to the sentence one [**1a**] requirement of a primary purpose to "provide descriptive information." A5598; A2360. Nevertheless, in this Texas litigation, PMC proposed that very (narrow) interpretation as the *unambiguous* meaning of the disputed provision. A5-6. EchoStar, in contrast, proposed an (expansive) interpretation in which sentence two [**2**] is a separate grant of coverage for the listed control-related functions, without having to meet the "primary purpose" requirement in sentence one [**1a**]—and the listed functionalities thus are licensed as stand-alone

25

applications apart from any IPG system. A5. Rovi proposed a third (middle-ground) interpretation harmonizing both the text of the license and the extrinsic evidence adduced during the Georgia trial, in which the field of use includes:

> (1) IPG Applications that include the core function of providing program listings and/or other descriptive programming information; (2) All features and functions of, or driven by, such IPG Applications, including those representatively listed in sentence two ..., without having to meet the requirement of providing descriptive information and regardless of whether accessed through a display of descriptive information; and (3) Devices (*e.g.*, set-top boxes) and processes (*e.g.*, filtering, decryption and decoding) implementing IPG Applications and the features and functions used with them.

A2347; A4997-98. That is, Rovi proposed that paragraph 1.3 be read to provide broad, end-to-end coverage for full-featured IPG systems—but not for exclusive coverage of stand-alone functionalities outside and away from any guide.[3]

In the Georgia litigation, the district court expressed skepticism regarding PMC's narrow interpretation but ultimately found the scope of the licensed field ambiguous. A5248-50. And as noted, during the ensuing bench trial, PMC's general counsel flatly rejected PMC's narrow interpretation. A5598. Nevertheless, in this Texas litigation the magistrate concluded that the exclusive IPG license agreement *unambiguously* required PMC's narrow interpretation. A5-6. And after finding the license unambiguous, the magistrate recommended that summary

---

[3] Consistent with the Georgia court's finding, Rovi also proposed that if the district court concluded that the agreement was unambiguous, then it should adopt the construction of the disputed language proposed by EchoStar. A6284.

judgment be granted in PMC's favor on the ground that PMC's original and amended complaints "do not target IPG functionality." A10.

The district court subsequently denied the timely objections filed by Rovi and EchoStar, and entered a partial final judgment in PMC's favor under FED. R. CIV. P. 54(b)—permitting this appeal without any further delay. A12.

## IV.    SUMMARY OF ARGUMENT

1. *The district court erred in construing the exclusive license.*

The district court erred in concluding that the exclusive IPG license is unambiguous, and that its unambiguous scope is so narrow as to render the heavily negotiated and dearly bought license virtually worthless. A5-6. The proceedings in this case, as well as those in the Northern District of Georgia, demonstrate that there are at least three possible interpretations of the disputed provision found in the first two sentences of the license agreement's paragraph 1.3. A2360; A5249-50. The license provision is thus ambiguous as a matter of law. A5248-50.

*First possible interpretation.* The provision might be read such that each of the functionalities listed in sentence two [**2**] must individually satisfy the "primary purpose" requirement described in the first clause of sentence one [**1a**]. Under this (narrow) reading, the phrase "[s]uch IPG Applications shall include, without limitation, tuning, ... recording, ... video on demand, ... [and] pay per view" means that each of these listed functionalities is *only* included *if* its "primary purpose ... is

27

to provide descriptive information." A2360. While the district court here adopted this interpretation as the unambiguous meaning of the provision (A5-6), the district court in Georgia found this reading unpersuasive and noted that it rendered sentence two [**2**] superfluous (A5249-50). In fact, this interpretation is deeply problematic. Tuning, for example, will never have the primary purpose of providing descriptive information (A5598)—and thus could never be covered under this reading. Independently subjecting each of the specified functionalities to the "primary purpose" requirement would therefore effectively limit the scope of licensed field to virtually worthless IPG systems. PMC's general counsel flatly rejected this approach during the bench trial before the Georgia court. A5598.

*Second possible interpretation.* The provision might be read such that the grant of coverage in sentence two [**2**] is entirely separate from the grant of coverage in sentence one [**1**]. Under this (expansive) reading, the second sentence provides complete, stand-alone coverage of the specified functionalities without regard to whether they are connected with an interactive program guide that satisfies the "primary purpose" requirement of the first sentence. A2360; A5. The Georgia court reasoned that this interpretation better accounted for the "shall include" language of the second sentence [**2**], but acknowledged that the propriety of this expansive reading was also not free from doubt. A5249-52.

*Third possible interpretation.* The provision also can (and should) be read to provide complete, end-to-end coverage of a robust IPG system—such that, *when connected to the use of a guide that satisfies the "primary purpose" requirement* of sentence one [**1a**], the many functionalities specified in sentence two [**2**] are covered in their entirety. Under this (middle-ground) reading, the second sentence [**2**] is not entirely detached from the first clause of the first sentence [**1a**] (as in the expansive proposal), nor is it subsumed under the first clause [**1a**] (as in the narrow proposal). Instead, the second sentence [**2**] links back to the second clause of the first sentence [**1b**]—which describes features that may be connected with a guide application and may "control Consumer equipment that enables viewing, listening, recording or storing of" television programming. A2360. These are the very types of features called out in sentence two [**2**]. The specified functionalities are thus covered in full whenever implemented in connection with a guide application that meets the "primary purpose" requirement of sentence one [**1a**].

This middle-ground reading further ensures that the full-featured IPG systems the parties intended to cover are in fact covered (A2365), and aligns with the parties' manifest intent for the broad (but not unlimited) scope of their significant transaction (A4654; A5045-46; A5615-16). While this third reading thus has obvious advantages over the narrow and expansive interpretations, Rovi does not ask the Court to select from the competing constructions. The critical

point for present purposes is that the existence of these alternatives establishes ambiguity as a matter of law. Remand is thus appropriate for a proper construction following full consideration of the extrinsic evidence by the district court.

### 2. *The district court erred in granting summary judgment.*

The district court also erred in granting summary judgment on PMC's declaratory judgment action with respect to the scope of the exclusive IPG license. A10-11. That judgment cannot stand for three separate reasons.

*First*, it was based on the district court's erroneous determination that the contract was legally unambiguous. Having misconstrued the scope of the license as a matter of law, the court erred in concluding that PMC was entitled to judgment based on that misconstrued scope as a matter of law. A10-11.

*Second*, PMC failed to introduce competent summary-judgment evidence of any kind—and thus neither satisfied its initial summary-judgment burden nor triggered any need for the introduction of opposing evidence. Assuming *arguendo* that the district court's construction of the license had been correct, PMC was still obligated (as summary-judgment movant) to introduce competent evidence that would (if unrebutted) support a judgment that none of the accused functionalities could possibly have a primary purpose of providing descriptive information. But PMC introduced no evidence. It simply pointed to its unverified original and second amended complaints—neither of which constitutes competent summary-

judgment evidence, and neither of which addresses the primary purpose of any accused functionality in any event. A10; A4769. PMC thus never carried its burdens, and the summary judgment is without legal support.

*Third*, under any construction of the license, there are genuine disputes of material fact regarding the nature of the functionalities that PMC has accused of infringement. For example, the district court noted (without any substantive discussion) that PMC's infringement claims "do not target IPG functionality." A10. But PMC has explained that its complaints target functionality that includes recording, pay per view, and video on demand, in addition to the "transmission, encryption, decryption, processing, ... or delivery of television programs." A4769; A2808. The license agreement expressly identifies some of these features (recording, pay per view, and video on demand in particular) as "IPG Applications" and IPG "functionality." A2360. PMC's own internal memorandum further identifies ███████████████████████████████████

███████████████████████████████████████████████████████████

A5160-63. This record evidence raises—at the very least—a genuine dispute regarding whether PMC is targeting "IPG functionality" in this case. A10.

Even if the district court had not erred in construing the exclusive IPG license, and even if PMC had introduced competent summary-judgment evidence, these genuine disputes of material fact would alone preclude the judgment.

31

## V.    ARGUMENT

### A.    Standard of Review

Rovi's first issue presented, relating to the interpretation of the exclusive IPG license, is subject to de novo review. "Interpretation of contract terms is a matter not unique to [this Court's] exclusive jurisdiction and is therefore reviewed under regional circuit law." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006). Under both the law of the regional circuit (the Fifth Circuit) and the law governing the agreement at issue (Delaware), the interpretation of any contract—including determining whether an ambiguity exists—is a question of law reviewed de novo. *Id.*; *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co.*, 642 F.3d 506, 509 (5th Cir. 2011); *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992); *Phillips Home Builders v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997); A4785.

Rovi's second issue presented, relating to the district court's grant of summary judgment, is also subject to de novo review. Like contract interpretation, this Court reviews a "district court's grant of summary judgment under regional circuit law." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014). And the Fifth Circuit reviews such "a grant of summary judgment de novo, applying the same standard as the district court." *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013); *see also Phillips*, 700 A.2d at 129.

## B.    The District Court Erred in Construing the Exclusive License.

The primary goal of contract interpretation, under Delaware law, is to "attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003). In construing contractual language, the "true test" is "what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc*, 616 A.2d at 1196. If the "relevant contract language is clear and unambiguous," the language should be given "its plain meaning." *Phillips*, 700 A.2d at 129. But if the "provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings," then the contract is legally ambiguous. *Rhone-Poulenc*, 616 A.2d at 1196. The same is true when both of the principal competing interpretations are "problematic" and potentially "could be applied in ways that a reasonable person probably would not have intended." *Phillips*, 700 A.2d at 129-30.

When the contractual language is unambiguous, extrinsic evidence should not be used to create an ambiguity. *Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997). "But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms." *Id.*

Applied to the exclusive IPG license, these rules confirm that the district court erred in concluding that the disputed contractual language unambiguously required a narrow reading—particularly when that language is fairly susceptible to at least two additional readings, both of which are less problematic than the narrow reading selected by the court. Extrinsic evidence therefore must be considered, and the relevant evidence already adduced in the Georgia litigation confirms Rovi's middle-ground interpretation as the reading that best aligns with the reasonable shared expectations of the parties. This Court should thus reverse and remand for a correct construction following full consideration of the extrinsic evidence.

1. **The parties' competing proposals confirm that the license is ambiguous—requiring consideration of the extrinsic evidence.**

The principal dispute in this appeal concerns the reading of the first two sentences of paragraph 1.3, which defines the scope of the licensed field:

> [**1**] The 'Interactive Program Guide' field means applications and services (collectively 'IPG Applications'), [**1a**] *the primary purpose of which is to provide descriptive information* (including without limitation program listings) relating to television or radio programming available to consumers, [**1b**] and *which may, or through actions by a Consumer may, control consumer equipment that enables viewing, listening, recording or storing of such television or radio programming ....* [**2**] Such IPG Applications *shall include, without limitation, tuning, flip, browse, parental control, recording, reminders, favorites, searching or sorting listings by any category or criteria, video on demand, near video on demand, pay per view*, picture in guide functionality, help, user profile setup, generation or use, TV mail, TV chat, and TV newsgroups.

A2; A2360. The first district court to consider this language, from the Northern District of Georgia, found it ambiguous. A5248-50. In so finding, the Georgia court acknowledged that this provision was susceptible to conflicting interpretations, including both the narrow reading advocated by PMC and the expansive reading now advocated by EchoStar. A5248-49. While the Georgia court reasoned that—based on the text alone—the expansive reading was "more persuasive" than the narrow reading, it rightly concluded that the existence of these potential alternative readings rendered the provision legally ambiguous. A5250. In sharp contrast, the district court in this case not only found the narrow reading more persuasive; it concluded that the license *unambiguously* required the narrow reading. A5-6. That conclusion was in error, and this Court should hold, in line with the Georgia court's conclusion, that the provision at issue is ambiguous.

*PMC provides one alternative interpretation.*

The district court, adopting PMC's proposed reading, concluded that each of the functions specified in sentence two [**2**] must individually satisfy the "primary purpose" requirement of sentence one [**1a**]—such that "tuning," or "parental control," or "recording" is licensed only "<u>if</u> the primary purpose of the application is to provide descriptive information." A6. But the Georgia court recognized that this narrow reading is problematic, as it renders the second sentence superfluous: "[u]nder PMC's interpretation, the Specified Applications are to be treated the

35

same as any other application or service in that the Specified Applications must meet the first sentence's primary purpose test." A5249. Thus, the "removal of the second sentence would change nothing under PMC's proposed construction." A5249. Delaware law holds that such interpretations should be avoided where possible. *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001).

PMC's narrow reading is even more deeply flawed. An "objective, reasonable third party" (A5), would understand that some of the specified applications—"tuning" is a key example—can *never* satisfy the "primary purpose" requirement (A5598). The only (and thus primary) purpose of tuning is to tune to a channel frequency; not to provide descriptive information. If the applications specified in sentence two [**2**] must each satisfy the "primary purpose" requirement of sentence one [**1a**], tuning will *never* be licensed—and the licensed IPG field covers only (virtually worthless) IPGs *that cannot be used to tune to a channel frequency*. That makes no sense. A5617 (Holtzman: "█████████████████████ ████████████████████████████████████████████"). And no reasonable third party would read the second-sentence [**2**] phrase "Such IPG Applications shall include ... tuning" to mean that "Such IPG Applications shall *never* include ... tuning." A2360; A5598. Certainly no reasonable third party would find that to be the *unambiguous* meaning of the disputed provision.

CONFIDENTIAL MATERIAL OMITTED

A similar analysis holds for other sentence-two [2] functions. A2360. For example: the primary purpose of "flip" is to flip between channels, the primary purpose of "parental control" is to provide parental control, and the primary purpose of "recording" is to record. A2504. Considering that the provision of descriptive information is necessarily subordinate—if not entirely irrelevant—to these control-related functions, the parties could not have reasonably expected to license these functionalities only to the extent that the primary purpose of flip, parental control, and recording is to provide descriptive information.

PMC's reading also conflicts with paragraph 2.6 of the exclusive IPG license, which confirms that the licensed field is intended to cover, among other systems, TV Guide Interactive. A2365. Anyone remotely familiar with that system, including the parties to the agreement, understood that it offered far more than just descriptive information. A4899-901. If every feature provided by TV Guide Interactive—including tuning, flip, parental control, recording, video on demand, and pay per view—was independently subject to a "primary purpose" requirement,

then much of Rovi's full-featured IPG system would not be covered by the license expressly intended to provide just that coverage.[4] A2360; A2365; A4900-01.

There are thus good reasons to doubt that PMC's reading reflects "the reasonable shared expectations of the parties at the time they contracted." *Comrie*, 837 A.2d at 13; *Rhone-Poulenc*, 616 A.2d at 1195.[5]

*EchoStar provides another alternative interpretation.*

EchoStar proposes a radically different reading of these provisions. According to EchoStar, the grant of coverage in sentence two [**2**] is entirely

---

[4] PMC's reading also conflicts with paragraph 2.1. According to PMC, the licensed field only covers inventions relating to the provision of descriptive information. A5-6. As such, tuning, recording, and, e.g., "metering" are not covered insofar as they relate to tuning, recording, and metering, but only insofar as they relate to the provision of descriptive information. A5-6. Paragraph 2.1 confirms that the field cannot be read so narrowly: it covers "all of the inventions" in the Harvey patents—e.g., "metering"—whenever the invention "relating to 'metering,'" or relating to any other functionality addressed by the Harvey patents, is used in the licensed field. A2362. Paragraph 2.1 thus clarifies that the invention can be directed to something *other* than providing descriptive information and *still be licensed* through its use in connection with the Interactive Program Guide field.

[5] Indeed, PMC's reading (as adopted by the district court) appears to violate the rule of *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097 (Fed. Cir. 2004), which reiterates "the basic contract law principle that a party may not assign a right, receive consideration for it, and then take steps that would render the right commercially worthless." *Id.* at 1101. The exclusive IPG license was manifestly intended to cover robust IPG systems such as TV Guide Interactive. A2365; A5058; A5086. But having received substantial consideration for this license, PMC now argues that it should be read so as to cover only extremely limited IPGs—thus rendering the license commercially worthless. A5598; A5046; A5180. Such a reading cannot be correct. *Jacobs*, 370 F.3d at 1101.

separate from the grant of coverage in the first clause of sentence one [**1a**]—such that the second sentence provides complete, stand-alone coverage of the numerous specified applications and services without regard to whether they are connected with an interactive program guide that satisfies the "primary purpose" requirement of the first sentence. A5. The Georgia court reasoned that this expansive interpretation better accounted for the "shall include" language of the second sentence than PMC's narrow interpretation. A5249-50.

This expansive reading, however, is also somewhat problematic. The district court in this case suggested that this reading of the second sentence is in tension with the third sentence [**3**] of paragraph 1.3. A6. The Georgia court suggested that it is in tension with the fourth sentence [**4**] of paragraph 1.3 A5250. PMC argues that this expansive reading is inconsistent with two of the non-exclusive licenses that were signed along with the exclusive license. A4766; A5253; A5708-09. At a high level, an "objective, reasonable third party" (A5) might wonder whether the parties actually intended an *"Interactive Program Guide" license* covering an *"Interactive Program Guide" field* to provide complete, stand-alone coverage of "advanced non-IPG technologies" (A5252), without regard to whether those technologies are connected with an *"Interactive Program Guide"* (A5-6).

*These competing (but problematic) alternatives demonstrate ambiguity.*

Considering these contrasting proposals, a "reasonable person in the position of the parties" might well conclude that PMC's reading of paragraph 1.3 is too narrow, and EchoStar's reading of paragraph 1.3 is too broad. *Rhone-Poulenc*, 616 A.2d at 1196; *see also Phillips*, 700 A.2d at 129. While the existence of these alternative interpretations does not fully resolve the dispute between the parties, it does lead to one inescapable conclusion: paragraph 1.3 is legally ambiguous. As in *Phillips*, the language is subject to competing, "problematic" interpretations, each of which "could be applied in ways that a reasonable person probably would not have intended." 700 A.2d at 129-30. And as in *ConAgra*, one court has found an "expanding" interpretation persuasive, while another has adopted a "limiting" interpretation. *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68-69 (Del. 2011).[6] The Georgia court was right to find ambiguity in paragraph 1.3, and the district court in this case erred in concluding otherwise.

---

[6] *See also*, *e.g.*, *Comrie*, 837 A.2d at 14 (finding ambiguous: "equivalent substitute or replacement awards"); *Eagle*, 702 A.2d at 1231 (finding ambiguous: "arising from such suits ... or other proceedings, the basis for which arose or occurred on or prior to the Close Date"); *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 629 (Del. 2003) (finding ambiguous: "practicing").

*Rovi provides a third alternative interpretation.*

The ambiguity in the license is further confirmed by the existence of a third reading: a measured interpretation charting a middle course between the narrow interpretation of PMC and the expansive interpretation of EchoStar.

Rovi proposes that the second sentence [**2**] is intended to make clear that the license provides complete, end-to-end coverage of the many applications and services specified in the sentence (without limitation) *whenever such functions are connected to the use of a guide* that satisfies the "primary purpose" requirement. Under this reading, the second sentence [**2**] is not entirely detached from the first clause of the first sentence [**1a**] (as in EchoStar's interpretation), nor is it subsumed under the first clause of the first sentence [**1a**] (as in PMC's interpretation). Instead, the second sentence [**2**] links back to the second clause of the first sentence [**1b**]—which describes features that may be connected with a guide application and may "control Consumer equipment that enables viewing, listening, recording or storing of" television programming. A2360. These are the very types of features called out in sentence two [**2**]. The specified functionalities are thus covered in full whenever implemented in connection with a guide application that meets the "primary purpose" requirement of sentence one [**1a**].

Viewed in this light, the district court erred by focusing exclusively on the first clause of the first sentence [**1a**]. A5. While [**1a**] describes an application with

41

a "primary purpose" of *providing descriptive information* relating to programming, [**1b**] indicates that such an application may be connected to other applications (with other primary purposes) that are directed to *controlling the equipment* that enables viewing, listening, recording, or storing that programming. A2360. Indeed, [**1a**] is written to suggest a singular antecedent ("the primary purpose of which is")—indicating reference to one underlying, guide-based system. In contrast, [**1b**] is written to suggest plural antecedents ("control Consumer equipment")— indicating reference to the numerous control-related applications that may be implemented in connection with such a guide-based system. A2360. Giving effect to both clauses makes sense, as together they provide a fair encapsulation of the robust interactive program guides that the parties set out to license—which provided descriptive information *as well as* control of the TV viewing experience. A2360; A2365. That is, the expressly covered interactive program guides (such as TV Guide Interactive) provided descriptive information relating to programming *connected with* control of the consumer equipment for viewing, recording, or storing that programming. A2365; A4899-902; A5300-01; A5039; A6272.

Rovi's middle-ground reading also comports with paragraph 2.6. When the license says that TV Guide Interactive is covered, that means that TV Guide Interactive is covered: not only for providing descriptive information, but also for

its numerous other functionalities, including tuning, recording, pay per view, video on demand, among many others.[7] A2365; A2360; A4899-902; A5300-01; A5039.

While the link between the second sentence [**2**] and the second clause of the first sentence [**1b**] is perhaps imperfectly expressed in paragraph 1.3—hence the ambiguity—Rovi's reading aligns best with the text of the license and the parties' unmistakable intentions for the broad (but not unlimited) scope of their heavily negotiated deal. The applications and services listed in the second sentence are covered, in their entirety—but only when they are implemented in connection with (or "driven by") a guide that meets the "primary purpose" requirement. A2347. In any event, this third and middle-ground alternative reading further confirms that the critical sentences of paragraph 1.3 are ambiguous. *Phillips*, 700 A.2d at 130; *ConAgra*, 21 A.3d at 68-69. The relevant extrinsic evidence must therefore be considered before the license can be construed. *Eagle*, 702 A.2d at 1232.

---

[7] Similarly, when paragraph 2.1 says that "this exclusive license includes all of the inventions" in the Harvey patents "when used within the Interactive Program Guide field," it means what it says: every invention in the Harvey patents, whether directed to "metering," or "tuning," or "recording," or "pay per view," or "video on demand," is exclusively licensed—when it is used in connection with a guide application that provides descriptive information relating to programming. A2362; A2360. "Metering" may not be licensed in the abstract, but to the extent that a robust IPG system offers "metering," that functionality is licensed in full.

43

2. **The extrinsic evidence supports Rovi's reading and forecloses the district court's construction.**

While the district court concluded that there was no cause to consider the extrinsic evidence, it did highlight two bits of testimony from participants in the license negotiations as especially relevant pieces of extrinsic evidence. A9-10. Significantly, both of those testimonial snippets support Rovi's reading, and undermine the district court's interpretation of the license provisions.

In the first snippet, Guiliano (Rovi's outside counsel) testified that the first two sentences of paragraph 1.3 were "intended to convey" that, "[s]o long as you had an application that passed the primary purpose test," there "could be a very long list of features and functions that [the] guide could provide that—and that guide would still be within the field-of-use as defined here." A9. Guiliano did *not* say, as the district court held and as PMC proposes, that the listed "features and functions" are covered only if they independently pass the "primary purpose" test. *Nor* did he say, as EchoStar proposes, that the listed "features and functions" are covered without regard to whether they are connected with a guide. Instead, he testified—as Rovi proposes—that the "features and functions" in the "very long list" found in sentence two [**2**] are fully covered so long as they are provided in connection with "an application that passed the primary purpose test." A9.

In the second snippet, Holtzman (PMC's general counsel) echoed Guiliano: "If any of those features are included in an application or a guide that satisfies the

primary purpose test, all of those features, VOD, Pay Per View, any of them are licensed exclusively. But they are not licensed exclusively as stand-alone functions outside and away from a guide. That has been our position since day one." A10. Again, Holtzman did *not* say, as the district court held and as PMC proposes, that "all of those features" are subject to the "primary purpose" test. *Nor* did he say, as EchoStar proposes, that "all of those features" are exclusively licensed as stand-alone functions outside and away from a guide. Instead, he testified—as Rovi proposes—that "all of those features" specified in sentence two [**2**] are "licensed exclusively" whenever they are implemented in connection with "a guide that satisfies the primary purpose test." A10; A5064.

The extrinsic evidence highlighted by the district court thus undermines its reading of the exclusive IPG license. The extrinsic evidence ignored by the court further forecloses that narrow reading. While Holtzman's cited testimony supports the reading of paragraph 1.3 proposed by Rovi, for example, elsewhere he flatly rejected the reading proposed by PMC and adopted by the district court:

> Q. For these [sentence-two] features to be included in the IPG field, they do not have to provide descriptive information related to television and radio programming. Isn't that true?
> A. Sure, most of them can't.

A5598. Holtzman further confirmed that "one of those functions and features is tuning" (A5598); that "tuning is absolutely necessary for an IPG to work"

45

(A5598); and that there was no doubt—notwithstanding that tuning never provides descriptive information—that it was covered by the parties' exclusive IPG license:

████████████████████████████████████████.

A5617. The same can be said for each of the applications and services listed in sentence two [**2**]: of course tuning, flip, browse, parental control, recording, reminders, searching or sorting listings, video on demand, pay per view, and the rest are licensed under paragraph 1.3—so long as they are implemented in connection with or driven by "████████████████." A5617; A2360.

This testimony from PMC's general counsel is further supported by the extrinsic evidence demonstrating the parties' intent to license the complete range of features for robust IPGs (A5084-86); PMC's understanding of robust IPGs as full-featured systems providing descriptive information *and* equipment control (A5159-64); Scott's on-site inspection of TV Guide Interactive (A5036-38); and PMC's subsequent and repeated assurances that the exclusive IPG license would provide, as Rovi insisted, "a field-of-use that included that product, all its features and functions, and its planned expansion" (A5086; A5031; A5084; A5184; A5592). All of this relevant extrinsic evidence, generally recounted above in the statement of the case, confirms that (unlike the StarSight license) the exclusive IPG license was intended to provide full coverage for robust IPG systems.

**CONFIDENTIAL MATERIAL OMITTED**

As Scott explained, "[i]t's one thing to deliver the schedule information and to control the device to display the schedule information"—that was covered by the narrow, virtually worthless StarSight license. A5079; A5050; A5076; A5018. But "[i]t's another to have" related software that "command[s] other elements either of a box or peripheral equipment to do certain functionality"—and such potentially extensive control-related functionality was covered by the far broader and far more valuable exclusive IPG license. A5079; A5024; A5058; A5084; A5087. This license includes exclusive, full, end-to-end coverage of all of the features and functionalities that might reasonably be implemented in connection with robust IPG systems such as TV Guide Interactive, encompassing (without limitation) the applications and services called out in sentence two [**2**]. A2360.

Review of the TV Guide Interactive reference manual included in PMC's summary-judgment briefing further confirms—given the clear intent to provide full coverage for that product—that the exclusive IPG license cannot reasonably be read to provide mere *access* to IPG-related functionalities such as recording, pay per view, and video on demand. A2360; A4899-956. The manual explains that TV Guide Interactive not only offered, e.g., "Accessing Video on Demand"; it further offered "Ordering Video on Demand Programs," "Watching Video on Demand Programs," and "Video on Demand Packages." A4900-01; A4933-36. This was far more than a simple informational guide; it was a robust, full-fledged system that

promised "COMPLETE CONTROL of your TV." A4902; *id.* ("With TV Guide Interactive, the world of Digital Cable is at your fingertips."). As Scott learned during his on-site inspection of the system, TV Guide Interactive provided descriptive information relating to television programming *as well as* extensive functionality to control the viewing, recording, and storing of that programming. A5036-38; A5039; A5300-01; A5159-64. And it was the parties' intent "to license a field-of-use that included that product, all of its features and functions, and its planned expansion." A5086; A5024; A5031; A5184; A5592.

Rovi's proposed (middle-ground) reading of the licensed field-of-use best comports with all of this illuminating extrinsic evidence, and best reflects and protects the manifest and reasonable shared expectations of the parties at the time of contracting. *Comrie*, 837 A.2d at 13; *Rhone-Poulenc*, 616 A.2d at 1196.

### 3. This Court should remand for a proper construction following full consideration of the extrinsic evidence.

Because the district court erred in concluding that the exclusive IPG license *unambiguously* required PMC's extremely narrow (and intractably problematic) proposed construction (A5-6), the Court should reverse and remand for a construction that takes full account of all the extrinsic evidence. *Eagle*, 702 A.2d at 1232-33; *ConAgra*, 21 A.3d at 72. Furthermore, because much of the extrinsic evidence is already in the record—a result of the four-day evidentiary trial held in Georgia—this Court should consider providing guidance, in connection with its

48

remand order, that addresses the shortcomings of both the narrow and expansive interpretations offered by PMC and EchoStar, respectively, and that confirms the strengths of the middle-ground interpretation offered by Rovi.

## C. The District Court Erred in Granting Summary Judgment.

Three summary-judgment rules control Rovi's second issue presented.

*First*, summary judgment may only be granted when the movant (PMC here) "shows that there is no genuine dispute as to any material fact and the movant is *entitled to judgment as a matter of law*." FED. R. CIV. P. 56(a) (emphasis added). A summary judgment that rests on a mistaken legal conclusion, therefore—such as the erroneous construction of a contractual provision—cannot stand on appeal. *Bayou Steel*, 642 F.3d at 509; *Phillips*, 700 A.2d at 129-30.

*Second*, as the movant for summary judgment on a claim for declaratory judgment brought in the Fifth Circuit and governed by Delaware substantive law, PMC bore the burdens to: (a) "cit[e] to particular parts of materials in the record" demonstrating the absence of a genuine dispute of material fact, FED. R. CIV. P. 56(c)(1)(A); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994); and (b) "produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence," 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.40[1][c] (3d ed. 2014); *accord L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006); *Hexion Specialty Chems.*,

*Inc. v. Huntsman Corp.*, 965 A.2d 715, 739 (Del. Ch. 2008); *Robertshaw v. Pudles*, No. 11-CV-7353, 2013 U.S. Dist. LEXIS 109806, at *84-85 (E.D. Pa. Aug. 5, 2013). These "exacting" burdens required competent summary-judgment evidence. And unverified pleadings are *not* competent summary-judgment evidence. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987); *Isquith v. Middle S. Utils.*, 847 F.2d 186, 194 (5th Cir. 1988); *Diamond Offshore Co. v. A & B Builders*, 302 F.3d 531, 544 n.13 (5th Cir. 2002). Furthermore, "a non-movant is required to provide opposing evidence" only if the movant has met its burdens and "provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed. Cir. 2006); *see also Russ v. Int'l Paper Co.*, 943 F.2d 589, 591-92 (5th Cir. 1991).

*Third*, assuming that the movant's initial burdens have been met, a "genuine dispute as to a material fact" will nevertheless preclude summary judgment when the "evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Haverda*, 723 F.3d at 591. In making this determination, a court "must draw all reasonable inferences in favor of the nonmoving party," "may not make credibility determinations or weigh the evidence," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

These rules confirm that the district court erred in granting summary judgment in PMC's favor for three separate reasons: *first*, the judgment rests on the district court's erroneous construction of the exclusive IPG license; *second*, PMC offered only its unverified pleadings as ostensible summary-judgment evidence, and thus failed to meet its initial burdens as the summary-judgment movant; and *third*, even if the district court had correctly construed the license, and even if PMC had offered competent summary-judgment evidence, genuine disputes of material fact would still preclude the judgment.

### 1. **The summary judgment rests on an erroneous construction of the exclusive IPG license**.

As shown above, the district court erred in concluding that the exclusive IPG license agreement is unambiguous, and that its unambiguous scope is so narrow as to render the heavily negotiated and dearly bought license virtually worthless. Because that underlying conclusion should be rejected—and the case remanded for a proper construction that takes account of the relevant extrinsic evidence—the summary judgment based on that underlying conclusion should be reversed. A11-13; *Bayou Steel*, 642 F.3d at 509; *Phillips*, 700 A.2d at 129-30.

### 2. **PMC failed to identify or introduce competent summary-judgment evidence of any kind.**

The district court further erred in crediting PMC's unsworn allegations as competent summary-judgment evidence. In support of its motion for summary

51

judgment, PMC cited *only* to its original and second amended complaints—neither of which is verified or otherwise meets Rule 56's requirements for summary-judgment affidavits. A4769; A1013-27; A4527-41; *Isquith*, 847 F.2d at 194; *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); FED. R. CIV. P. 56(c)(4). The district court recognized that PMC cited only to "its original and amended complaints" as purported summary-judgment proof, but the court reasoned that it would "not require PMC to prove a negative in the way that Defendants demand." A10.

But the question is not what Defendants demand; it is what *the rules and the case law* demand—and they require that "the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial," *Russ*, 943 F.2d at 592; that this obligation must be satisfied by "identifying [the relevant] parts of the record," *Johnston*, 14 F.3d at 1056; and that a plaintiff's "complaint can be considered as summary judgment evidence" only to the extent that it is verified *and* otherwise "comports with the requirements of [Rule 56(c)(4)]," *King*, 31 F.3d at 346; *see also Diamond Offshore*, 302 F.3d at 544 n.13 ("[A] petition does not constitute proper summary judgment evidence.").

Assuming *arguendo* that the district court's construction of the exclusive license had been correct, PMC was obligated, at the very least, to introduce or cite to verified record evidence that would (if unrebutted) support a judgment that none of the accused functionalities could possibly have a primary purpose of providing

52

descriptive information relating to television or radio programming available to consumers. A5; A10; A2360; *Russ*, 943 F.2d at 592; *Saab Cars*, 434 F.3d at 1369. PMC might, for example, have offered a non-conclusory expert affidavit to that effect. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005). But it did not do so. And the simple citation to its original and amended complaints—which, in any event, do not directly address that issue—neither satisfied PMC's initial summary-judgment burdens nor triggered any obligation in the non-movants to introduce opposing evidence. *Russ*, 943 F.2d at 592; *Saab Cars*, 434 F.3d at 1369; *Diamond Offshore*, 302 F.3d at 544 n.13.

The district court's summary judgment is supported by nothing but the bare allegations in PMC's complaints (A10; A4769), and those unverified complaints do not even purport to address the primary purpose of any of the functionalities accused of infringement (A1013-27; A4527-41). The court's judgment that none of the accused functionalities fall within the scope of the licensed field is thus—as a legal matter—not supported at all. *Russ*, 943 F.2d at 592; *King*, 31 F.3d at 346. Reversal is independently appropriate on this ground alone.

### 3. **Under any construction, genuine disputes of material fact preclude summary judgment.**

Even if the district court had not erred in construing the exclusive IPG license, and even if PMC had introduced competent summary-judgment evidence, genuine disputes of material fact would still preclude the judgment.

The district court noted, without any substantive discussion, that PMC's original and amended complaints "do not target IPG functionality." A10. But the record evidence contradicts that conclusion. PMC's own summary judgment motion explained that PMC's complaints target functionality that "involves the transmission, encryption, decryption, processing, recording, or delivery of television programs." A4769. And elsewhere PMC has made clear that its targeted functionality also includes pay per view and video on demand. A2808; A5719.

All of this functionality—particularly when viewed in the light most favorable to the non-movants, *Haverda*, 723 F.3d at 591—can reasonably be characterized as IPG functionality. Indeed, the exclusive IPG license expressly provides that "IPG Applications shall include ... recording, ... video on demand, ... [and] pay per view," among much other IPG "functionality." A2360. However that provision of the license is interpreted, it should conclusively establish recording, video on demand, and pay per view as possible "IPG functionality." A10; A5000; A5708-09. And such IPG functionality necessarily involves the encryption, decryption, processing, and delivery of television programs. A5335-36. There is testimony in the record, for example, that encryption and decryption are central components of any IPG system: "███████████████████████████████

███████████████████████████████████████████████████

████████████████████████" A5324; A6067-70; A6076-77. PMC's own

CONFIDENTIAL MATERIAL OMITTED

internal memorandum further confirms ████████████████████████

████████████████████████████████████████████████████

████████████████████ A5160-63. Given PMC's concession that it is targeting

transmitting, processing, descrambling, and recording, this record evidence

raises—at the very least—a genuine dispute regarding whether PMC is targeting

"IPG functionality" in this case. A10; *Haverda*, 723 F.3d at 591.

The district court also concluded, without any specific citation to the record,

that there "is no genuine dispute that the accused instrumentalities do not meet the

'primary purpose' test of the Interactive Program Guide field-of-use as construed

above." A10. But as Rovi pointed out to the court, PMC itself took the opposite

position before another district court addressing the same issue:



A5281; A5000. And EchoStar submitted an expert affidavit—something PMC did

not do—explaining how the targeted EchoStar system functions, including its use

of transport streams with critical descriptive information regarding:



55

CONFIDENTIAL MATERIAL OMITTED

A5335. EchoStar further pointed out that its pay per view and video on demand services provide detailed information about programming content to entice the viewer to purchase or order a show, and that advertisements about programming and many interactive applications, such as audience polling on television broadcasts, also have a primary purpose of providing descriptive information relating to programming. A5326. Drawing every reasonable inference in favor of the non-movants (as must be done, *Haverda*, 723 F.3d at 591), this evidence was sufficient to raise a genuine dispute regarding the "primary purpose" of at least some of the functionality targeted by PMC in this case.

The district court thus erred in granting summary judgment—even under its overly narrow construction of the license, and notwithstanding PMC's failure to introduce any competent summary-judgment evidence.

Viewing the judgment through the prism of a more appropriate construction only magnifies the district court's error. As those who negotiated the license explained, "[s]o long as you had an application that passed the primary purpose test, that [provided] descriptive information relating to programming" (A9), then any features implemented in connection with that guide, such as "VOD, Pay Per View, any of them are licensed exclusively. But they are not licensed exclusively as stand-alone functions outside and away from a guide" (A5064).

Under this reading of the scope of the exclusive IPG license, the question for summary-judgment purposes is whether the functions targeted by PMC—such as, e.g., video on demand and pay per view—are implemented in connection with a program guide in the EchoStar system, or rather as "stand-alone functions outside and away from a guide." A5064. The evidence confirms that, in the EchoStar system, these and many other functions are implemented in connection with an interactive program guide. A4105 ("use the **Program Guide** to change channels ... and to buy pay per view programs"); A4103-06 (indicating that tuning, favorites, parental control, and pay per view, among other functions, are implemented in connection with an IPG); A5320 (indicating that video on demand is implemented in connection with an IPG); A5335-36 (same); A5708 ("███████████████ ████████████████████████████████████████████"). That PMC may have strategically elected not to accuse the provision of descriptive information itself does not change the licensed character of *all* of the "features and functions" implemented in connection with an IPG. A5086; A2360; A5064.

**CONFIDENTIAL MATERIAL OMITTED**

Under any construction of the exclusive IPG license agreement, therefore, genuine disputes of material fact preclude summary judgment. *Haverda*, 723 F.3d at 591. Reversal is also independently appropriate on this ground alone.[8]

## VI.    CONCLUSION AND RELIEF REQUESTED

For all of these reasons, this Court should reverse the district court's partial final judgment in its entirety—including the court's grants of summary and declaratory judgment and the dismissal with prejudice of all claims—and remand for any further proceedings that may be necessary.

---

[8] There is no need to determine, at this point, precisely which of the functions accused of infringement in this case fall within the scope of the exclusive IPG license agreement. Indeed, given the district court's erroneous construction of the license and PMC's failure to introduce any competent evidence regarding the primary purposes of those accused functions (or the "███████████" they are "███████████████████████" (A5281)), it may not be possible to make that determination at this point. Following remand, consideration of the extrinsic evidence, construction of the license in light of that evidence, and the introduction of competent proof regarding the relevant connections between the accused functions and the use of a program guide in EchoStar's system—at that point the district court will be in a position to make the determinations that PMC asked the court to make in its summary-judgment motion. A4769-70.

58

CONFIDENTIAL MATERIAL OMITTED

Date: January 21, 2015                    Respectfully submitted,


                                          /s/ Roderick G. Dorman

                                          Roderick G. Dorman
                                              *Principal Attorney*
                                          Marc Morris
                                          McKool Smith Hennigan, P.C.
                                          865 South Figueroa St., Suite 2900
                                          Los Angeles, CA 90017
                                          (213) 694-1200

                                          Joel L. Thollander
                                          McKOOL SMITH, P.C.
                                          300 W. 6th Street, Suite 1700
                                          Austin, Texas 78701
                                          (512) 692-8700

                                          *Attorneys for Defendants-Appellants Rovi
                                          Guides, Inc. and TVG-PMC, Inc.*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PERSONALIZED MEDIA | § | |
| COMMUNICATIONS, L.L.C. | § | |
| | § | |
| v. | § | Case No. 2:08-CV-70-RSP |
| | § | |
| ECHOSTAR CORP., et al. | § | |

**REPORT AND RECOMMENDATION**

Before the Court is PMC's Motion for Summary Judgment on its Claim for Declaratory

Judgment and on Certain Counterclaims (Dkt. No. 396, filed September 7, 2012).  PMC urges

the Court to grant summary judgment in favor of PMC on its declaratory judgment claim and

defendants' counterclaims concerning the Interactive Program Guide ("IPG") license.

**BACKGROUND**

Personalized Media is the assignee of the five asserted patents[1] in this action, which the

parties refer to as the Harvey patents.  In 2000, Personalized Media granted a license covering

the asserted patents to TVG-PMC, Inc.  Exclusive IPG License Agreement, Dkt. No. 155-1.  The

license agreement grants certain rights to the exclusive licensee:

> 2.1 License Grant.   [Personalized Media] hereby grants to
> [Exclusive Licensee] a perpetual, irrevocable, fully paid-up,
> worldwide, exclusive license, including the right to sublicense, to
> make, have made, use, sell, offer to sell, import or lease the
> inventions disclosed and claimed in the [asserted patents] within
> the Interactive Program Guide Field . . . .
>
> 2.2 Right to Sue.  [Exclusive Licensee] shall have the exclusive
> right, but not the obligation, to enforce the [asserted patents] in its
> own name against any Person operating in the Interactive Program
> Guide field.  This right shall include the exclusive right to sue and

---

[1]  The asserted patents are U.S. Patent Nos. 4,965,825; 5,109,414; 5,233,654; 5,335,277;
and 5,887,243.

A1

recover for infringement of the [asserted patents], including past infringement, within the Interactive Program Guide field . . . .

*Id.* at 4-5.  The license agreement provides the following definition for the Interactive Program Guide field:

1.3 The "Interactive Program Guide" field means applications and services (collectively "IPG Applications"), the primary purpose of which is to provide descriptive information (including without limitation program listings) relating to television or radio programming available to Consumers, and which may, or through actions by a Consumer may, control Consumer equipment that enables viewing, listening, recording or storing of such television or radio programming, but where such IPG applications are not primarily intended to provide descriptive information relating solely to advertising or promotional programming available to Consumers.  Such IPG Applications shall include, without limitation, tuning, flip, browse, parental control, recording, reminders, favorites, searching or sorting listings by any category or criteria, video on demand, near video on demand, pay per view, picture in guide functionality, help, user profile setup, generation or use, TV mail, TV chat, and TV newsgroups. The Interactive Program Guide field shall also include the ability to access from such IPG Applications any other interactive or passive application, service or feature; provided, however, that the creation, distribution, transmission and use by a Consumer of such other interactive or passive applications, features or services or the television or radio programming accessible through such IPG Applications shall not be deemed to be included in the Interactive Program Guide field. The Interactive Program Guide field shall further include the ability to provide additional programming created or provided by [Exclusive Licensee] or any of its Affiliates that may be unrelated to the primary purpose of the Interactive Program Guide field, which additional programming is integral to and a part of the IPG Applications, and where the purpose of such additional programming is to be viewed or heard by a Consumer while using the IPG Applications. The Interactive Program Guide field shall further include any supplemental video, audio, text, graphics or multimedia, including but not limited to advertising or e-commerce opportunities of any kind, provided within the IPG Applications. The Interactive Program Guide field shall further include the generation and transmission of information resulting from the use of the above-described functionality ("Backhaul Data"). The Interactive Program Guide field shall also include any device, portion of device, or process to the extent that it is used to

> implement the above-described functionality, which functionality
> may be provided via any Media.

*Id*. at 2-3.

## APPLICABLE LAW

### Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).   Any evidence must be viewed in the light most favorable to the

nonmovant.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v.*

*S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).   Summary judgment is proper when there is no

genuine dispute of material fact.   *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).   "By its very

terms, this standard provides that the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine [dispute] of material fact."   *Anderson*, 477 U.S. at 247-

48.   Once the movant has made a showing that there are no genuine issues of material fact to be

tried, the burden shifts to the nonmoving party to raise triable issues of fact.   *Id.* at 249-50.   The

substantive law identifies the material facts, and disputes over facts that are irrelevant or

unnecessary will not defeat a motion for summary judgment.   *Id.* at 248.   A dispute about a

material fact is "genuine" when the evidence is "such that a reasonable jury could return a

verdict for the nonmoving party."   *Id.*

### Contract Interpretation

Contract interpretation is a matter of law to be decided by the court. *See Paul* v. *Deloitte*

*& Touche LLP,* 974 A.2d 140, 145 (Del. 2009).   Both parties agree that Delaware law governs

the interpretation of the contract.   Delaware follows an objective theory of contracts. *Estate of*

*Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del. 2010). Under this theory, the contract is to be construed in the manner that would be understood by "an objective, reasonable third party." *Id.* A contract is to be interpreted to give effect to the mutual intention of the parties as it existed at the time of contract formation, and such intent must be inferred, if possible, solely from the written provisions of the contract. *See Ryan* v. *Butera, Beausang, Cohen* & *Brennan,* 193 F.3d 210, 215 (3d Cir. 1999). Moreover, a contract should not be construed in such a way as would render any part of the contract mere surplusage, meaningless or illusory. *Estate of Osborn* v. *Kemp,* 991 A.2d 1153, 1159 (Del. 2010). Absent an ambiguity, the court must give the contract language its ordinary and usual meaning. *Westfield Ins. Group* v. *JP.* 's *Wharf, Ltd,* 859 A.2d 74, 76 (Del. 2004).

Extrinsic evidence is not admissible on the question of whether an ambiguity exists. *O'Brien* v. *Progressive Northern Insurance Company,* 785 A.2d 281, 288~89 (Del. 2001). The fact that the parties disagree on the correct interpretation of the contract does not make the contract ambiguous. *Rhone-Poulenc Basic Chemicals Co.* v. *American Motorists Insurance Co.,* 616 A.2d 1192, 1196 (Del. 1992). Rather, a contract is ambiguous if it is subject to two different reasonable interpretations. *Id.* If the court determines that a contract is ambiguous, it then may consider extrinsic evidence such as "overt statements and acts of the parties, the business context, prior dealings between the parties, business custom and usage in the industry." *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch. 2003).

## DISCUSSION

### A.    Text of the Contract

*First Two Sentences of the IPG Field Definition*

The first two sentences of the IPG field definition read as follows:

> 1.3 The "Interactive Program Guide" field means **applications and services (collectively "IPG Applications"), the primary purpose of which is to provide descriptive information** (including without limitation program listings) relating to television or radio programming available to Consumers, and which may, or through actions by a Consumer may, control Consumer equipment that enables viewing, listening, recording or storing of such television or radio programming, but where such IPG applications are not primarily intended to provide descriptive information relating solely to advertising or promotional programming available to Consumers. **Such IPG Applications shall include, without limitation, tuning, flip, browse, parental control, recording, reminders, favorites, searching or sorting listings by any category or criteria, video on demand, near video on demand, pay per view, picture in guide functionality, help, user profile setup, generation or use, TV mail, TV chat, and TV newsgroups**.

(Emphasis added.)

Defendants essentially urge that the first and second sentences represent separate grants. For example, if "picture in guide functionality" is at issue, it is licensed regardless of whether the primary purpose of that functionality is to provide descriptive information relating to television or radio programming available to Consumers. PMC disagrees, contending that the primary purpose test applies to the entirety of the grant, and that the features listed in the second sentence are licensed in accordance with the first sentence.

The Court finds that an objective, reasonable third party would read the IPG field definition to require precisely what it sets forth in the first sentence: the only items covered in the "Interactive Program Guide" field are applications and services **the primary purpose of which is to provide descriptive information**.

Defendants' arguments fail for a number of reasons. Defendants rely primarily on the "without limitation" portion of the second sentence. The Court finds that the "without limitation" language denotes that the list of features recited in the second sentence is not

exhaustive.[2]  In other words, an application or service with the primary purpose of providing

descriptive information is covered even if not explicitly listed in the second sentence.  Under

Defendants' interpretation, simply adding the words "without limitation" to a given sentence in a

contract would serve to negate every other requirement or provision set forth in that contract,

regardless of the surrounding language.  This position is not objectively reasonable, and is

therefore rejected by the Court.

Additionally, the use of the terms "such" and "includes" at the outset of the second

sentence also suggests a definitive link between the first and second sentences – namely, that the

list set forth in the second sentence is a subset of examples of the "IPG Applications" generally

referred to in the first sentence, which are covered <u>if</u> the primary purpose of the application is to

provide descriptive information.

*Third Sentence of the IPG Field Definition*

The third sentence of the IPG field definition also supports this interpretation:

> The Interactive Program Guide field shall also include the ability
> to access from such IPG Applications any other interactive or
> passive application, service or feature; **provided, however, that
> the creation, distribution, transmission and use by a Consumer
> of such other interactive or passive applications, features or
> services or the television or radio programming accessible
> through such IPG Applications shall not be deemed to be
> included in the Interactive Program Guide field**.

(Emphasis added.)  Under Defendants' proposed interpretation of the first and second sentences

above, this third sentence would exclude items that had already been included in the second

sentence's list of examples.  In other words, if the "primary purpose" language in the first

sentence is inapplicable to the examples set forth in the second sentence, the second and third

---

[2] The Court observes that this is a common usage of the phrase "without limitation" in
contract drafting, which would be readily understood by an objective third party.

sentences are in direct and irreconcilable conflict.  Defendants Rovi and TVG-PMC attempt to remedy this inconsistency by once again claiming that this clause should be read in complete isolation from the surrounding language.  (*See* Dkt. 400 at 20.)  The Echostar Defendants take an even more remarkable position by alleging that the language in question applies to content rights – a position that is unsupported by either the plain language of the contract or any other evidence of record.  (*See* Dkt. 401 at 12 ("[t]hus, if a subscriber orders Star Wars as a pay-per-view movie, the PMC-Gemstar License does not provide rights from the studio to watch the movie."))  The Court finds that the third sentence supports the interpretation set out by the Court above – that the license grant covers only applications and services the primary purpose of which are to provide descriptive information.

*Seventh Sentence of the IPG Field Definition*

Defendants next rely on the seventh sentence of the IPG Field definition, which reads:

> The Interactive Program Guide field shall also include any device, portion of device, or process to the extent that it is used to implement the above-described functionality, which functionality may be provided via any Media.

The Echostar Defendants argue that this language is properly interpreted to mean that any device that uses the above-described functionality is licensed in its entirety.  This interpretation would render the "to the extent" language mere surplusage, which is contrary to law.  *Estate of Osborn,* 991 A.2d at 1159.  Instead, the reasonable interpretation of this language is exactly what the contract states on its face:  a device used is licensed **to the extent** that it is used to implement the functionality in question.  It follows that the device's use for other purposes would not be covered by this language.

*Contextual Clues and the Entirety of the Contract*

The structure of the above analysis reflects, to some extent, Defendants' attempt to analyze each sentence of the contract in a vacuum. But "[i]t is a general rule of contract construction to 'consider the entire instrument and attempt to reconcile all of its provisions in order to determine the meaning intended to be given to any portion of it.'" *In re IAC/Interactive Corp.*, 948 A.2d 471, 497 (Del. Ch. 2008) (quoting *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979)).

Defendants' argument is, at its core, that the exclusive license is not limited to the Interactive Program Guide field of use. (*See, e.g.*, Dkt. 400 at 22.) The context of the contract militates against this position. For example, the actual grant in the contract reads as follows:

> 2.2 Right to Sue. [Exclusive Licensee] shall have the exclusive right, but not the obligation, to enforce the [asserted patents] in its own name against any Person operating in the Interactive Program Guide field. This right shall include the exclusive right to sue and recover for infringement of the [asserted patents], including past infringement, within the Interactive Program Guide field . . . .

When read in this context, Defendants' position that the license is not limited to the Interactive Program Guide field of use seems to defy logic. While it is true that a contract drafter can define a term to mean whatever the parties desire, Defendant stretches this position paper-thin in asserting that the meaning of the phrase "Interactive Program Guide" bears no meaningful relationship to that of the "Interactive Program Guide field." (Dkt. 400 at 22.)

When reading all of the aforementioned language in context with the remaining portion of the contract, the Court finds that an objective third-party would read the license grant to be limited to the Interactive Program Guide field as defined above.

B.    **Extrinsic Evidence**

Having found no ambiguity in the contract, the Court need not review extrinsic evidence. However, the Court notes that even if the license were found to be ambiguous, the extrinsic evidence cited by the parties supports the above interpretation.

Take, for example, the testimony of Joe Guiliano, who negotiated the IPG License for Gemstar, who was asked "[t]ell me the thinking behind sentence number two and how it came to be included in this IPG field-of-use paragraph?"  Mr. Guliano responded:

> Well, I think we explained this to PMC actually. This is normally not the kind of thing I would put in a field-of-use, but we had an understanding from PMC as to how the prior license, the Starsight license, how they were interpreting it, and this was intended to convey that there could be a very long list of features and functions that a guide could provide that -- and that guide would still be within the field-of-use as defined here.
>
> **So as long as you had an application that passed the primary purpose test, that it provided the description, descriptive information relating to programming, this sentence was entitled -- was intended to convey the notion that I have been explaining, which is that from there there could be considerable number of features and functions that the guide would provide, and this is simply an illustrative list**, some of which I don't think exists today. There were things that I was sort of pulling out of thin air just to convey the message that it could be almost anything.

(Dkt. 259-3 at 98:10-99:4.) (Emphasis added.)  Mr. Guliano's testimony confirms that the second sentence sets forth a number of features that may be licensed if they meet the primary purpose test.

Even the extrinsic evidence cited by Defendants does not run counter to this interpretation:

> Q. And you also told him that within the IPG field-of-use, there were all the interactive and e-Commerce features explicitly called out in the T.V. Guide field. Isn't that true?

A. Yes, sir. You will see I referenced in the next to last paragraph that anything called out in that license agreement, the field license agreement, was included, and as best as we knew at the time and still believe to this day, all of those features are included in the license if the guide satisfies the primary purpose test. We have never changed. We've believed that since the day -- that was our intent since the day we agreed on May the 11th, May the 18th, December 29th, today. **If any of those features are included in an application or a guide that satisfies the primary purpose test, all of those features, VOD, Pay Per View, any of them are licensed exclusively. But they are not licensed exclusively as stand-alone functions outside and away from a guide. That has been our position since day one.**

(Dkt. 400-4 at 345-346.) (Emphasis added.)

Thus, even if the language in question were found to be ambiguous, extrinsic evidence would support the interpretation set forth by the Court in Section A above.

## C.     Lack of Material Factual Issues

Both parties stake their positions almost entirely on the contract interpretation dispute outlined above.  Defendants devote only a small portion of briefing to the proposition that a factual dispute remains if the Court rejects its proposed interpretation of the license.  (Dkt. 401 at 21; Dkt. 400 at 27.)  PMC has cited its original and amended complaints, which do not target IPG functionality.  Defendants respond with a single conclusory statement that "PMC provides no evidence … that it is not accusing an 'electronic television guide' of infringement."  (Dkt. 407 at 2.)  Given that PMC has provided evidence that shows they do not accuse functionality within the IPG field, and the Defendants have made no effort to show that they have any evidence to raise a triable issue of fact, this Court will not require PMC to prove a negative in the way Defendants demand.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

The Court observes that the evidence of record demonstrates that there is no genuine dispute that the accused instrumentalities do not meet the "primary purpose" test of the Interactive Program Guide field-of-use as construed above.

## CONCLUSION

In view of the foregoing, the Court finds that the contract at issue is unambiguous and does not cover the accused instrumentalities in this case.  Accordingly, the Court recommends that PMC's Motion for Summary Judgment on its Claim for Declaratory Judgment and on Certain Counterclaims (Dkt. No. 396, filed September 7, 2012) be **GRANTED**, the declaratory judgment requested in Count VI of PMC's Second Amended Complaint (Dkt. 374) be **GRANTED**, Counts Four and Five of the Echostar Defendants' Answer to PMC's Second Amended Complaint (Dkt. 382) be **DISMISSED WITH PREJUDICE**, and all remaining claims by or against Rovi/TVG (Dkt. 384) be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court.  Fed. R. Civ. P. 72(b)(2); *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**SIGNED this 10th day of January, 2014.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

PERSONALIZED MEDIA §
COMMUNICATIONS, L.L.C. §
                                                    §
                                                    §    Case No. 2:08-CV-70-RSP
     v.                                        §
                                                    §
ECHOSTAR CORP., et al.               §

<u>**ORDER**</u>

Before the Court are PMC's Motion for Summary Judgment on its Claim for Declaratory

Judgment and on Certain Counterclaims (Dkt. No. 396), and the Report and Recommendation of

the Magistrate Judge (Dkt. No. 419) recommending that the motion be granted.  Having

considered the objections filed by Defendants Echostar Corp. and Dish Network Corp. (Dkt.

Nos. 421 and 425) and by Defendants Rovi Guides, Inc. and TVG, Inc. (Dkt. Nos. 420 and 426),

and having conducted a *de novo* determination of those portions of the Report and

Recommendation as to which objection was made, and finding no error therein, the Court does

hereby adopt the findings and recommendations of the Magistrate Judge.  Accordingly,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment on its Claim for

Declaratory Judgment and on Certain Counterclaims (Dkt. No. 396) is GRANTED, the

declaratory judgment requested in Count VI of PMC's Second Amended Complaint (Dkt. 374) is

GRANTED, Counterclaim Counts Four and Five of the Echostar Defendants' Answer to PMC's

Second Amended Complaint (Dkt. 382) are DISMISSED WITH PREJUDICE, and all remaining

claims by or against Rovi/TVG (Dkt. 384) are DISMISSED WITH PREJUDICE.

**So ORDERED and SIGNED this 12th day of August, 2014.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

A12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

PERSONALIZED MEDIA                §
COMMUNICATIONS, L.L.C.            §
                                 §
   v.                           §         Case No. 2:08-CV-70-RSP
                                 §
ECHOSTAR CORP., et al.           §

## PARTIAL FINAL JUDGMENT

For the reasons assigned in the Order adopting the Report and Recommendation of the Magistrate Judge, and Court finding in accordance with Rule 54(b) that there is no just reason for delay in entry of judgment on the claims by and against Rovi Guides, Inc. and TVG-PMC, Inc., which is hereby expressly directed,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment on its Claim for Declaratory Judgment and on Certain Counterclaims (Dkt. No. 396) is GRANTED, the declaratory judgment requested in Count VI of PMC's Second Amended Complaint (Dkt. 374) is GRANTED, Counterclaim Counts Four and Five of the Echostar Defendants' Answer to PMC's Second Amended Complaint (Dkt. 382) are DISMISSED WITH PREJUDICE, and all remaining claims by or against Rovi Guides, Inc. and TVG-PMC, Inc. are DISMISSED WITH PREJUDICE.

So ORDERED and SIGNED this 12th day of August, 2014.

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2015, the foregoing CORRECTED NONCONFIDENTIAL BRIEF OF DEFENDANTS-APPELLANTS ROVI GUIDES, INC. AND TVG-PMC, INC. was served by operation of the Court's CM/ECF system per FED. R. APP. P. 25.

Date: January 21, 2015

/s/ Joel L. Thollander

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing CORRECTED NONCONFIDENTIAL BRIEF OF DEFENDANTS-APPELLANTS ROVI GUIDES, INC. AND TVG-PMC, INC.:

1.     complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B). This brief contains 13,937 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b). Microsoft Word 2010 was used to calculate the word count.

2.     complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

Date: January 21, 2015

/s/ Joel L. Thollander